**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | |
|---|---|
| **PORTIA ARMSTRONG, ERICHA EVANS, ABIGAIL LIDDELL, SANDRA MCINNIS, LORI OWENS, AMANDA PEARSON, FELISA WALTERS and PAUL WATSON,** individually and on behalf of all others similarly situated,<br><br>**Plaintiffs,**<br>v.<br><br>**FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF PASCAGOULA-MOSS POINT,**<br><br>**Defendant.** | **Case No.: 1:26cv180 HSO-BWR**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Portia Armstrong, Ericha Evans, Abigail Liddell, Sandra McInnis, Lori Owens, Amanda Pearson, Felisa Walters and Paul Watson ("Plaintiffs") bring this Class Action Complaint against First Federal Savings & Loan Association of Pascagoula-Moss Point ("FFSLA" or "Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1. Entities that provide services and handle customers' and employees' sensitive personal identifiable information (defined below) owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII to unauthorized persons, especially hackers with nefarious intentions, will result in harm to the affected individuals, including, but not limited to, the invasion of their private financial matters.

2. This class action arises out of Defendant FFSLA's failures to properly secure, safeguard, encrypt, and/or timely and adequately destroy Plaintiffs' and Class members' sensitive

personal identifiable information that it had acquired and stored for its business purposes.

3. According to its website, Defendant FFSLA "is a leader in mortgage lending for the gulf coast, providing unmatched service on mortgage loans and deposit accounts since 1955."[1] FFSLA provides a full line of checking, savings, certificates of deposit and individual retirement accounts to individuals and businesses.

4. According to cybernews sources, FFSLA exposed the personally identifiable information ("PII" or "Private Information")[2] belonging to Plaintiffs and potentially several thousand other Class members including, but not limited to, name, address, date of birth, phone number and/or Social Security number.[3]

5. On June 10, 2026, a known cybercriminal gang, WorldLeaks, claimed responsibility for a cyberattack against FFSLA, during which the cybercriminals were able to access and exfiltrate the Private Information of potentially several thousand customers that FFSLA managed (the "Data Breach").[4]

6. Prior to and through June 10, 2026, Defendant stored Plaintiffs' and Class members' PII unencrypted, in an Internet-accessible environment on Defendant's network. As a result of this Data Breach, Plaintiffs' and Class Members' Private Information was compromised and stolen and remains in the hands of those cybercriminals.

7. The Data Breach was a direct result of Defendant's failure to implement adequate

[1] https://firstwithus.com/our-legacy.html (last visited June 17, 2026).

[2] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

[3] https://www.hookphish.com/blog/ransomware-group-worldleaks-hits-first-federal-savings-and-loan/ (last visited June 17, 2026). *See also* https://www.dexpose.io/worldleaks-ransomware-attack-on-first-federal-savings-loan/ (last visited June 17, 2026); https://databreach.com/breach/first-federal-savings-and-loan-2026 (last visited June 17, 2026).

[4] *Id.*

and reasonable cybersecurity procedures and protocols necessary to protect the Private Information entrusted to Defendant for either services or employment or both.

8. Despite apparently learning of the Data Breach on or about June 10, 2026, and determining that Private Information was involved in the breach,[5] Defendant has yet to provide notice, or any information concerning the Breach to those affected, including Plaintiffs and Class members.

9. Plaintiffs' and Class members' exposed PII can be sold on the dark web. Hackers can access and then offer for sale the un-encrypted, unredacted PII to criminals. Plaintiffs and Class members now face a lifetime risk of (i) identity theft, which is heightened here by the loss of Social Security numbers, and (ii) the sharing and detrimental use of their sensitive information.

10. The PII was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect the Plaintiffs' and Class members' PII.

11. Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the Plaintiffs' and Class members' PII; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

12. Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the

[5] *Id.*

actual consequences of the Data Breach, including but not limited to lost time, (iv) the disclosure of their private information, and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

13. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II. PARTIES

14. Plaintiff Portia Armstrong is and at all times mentioned herein was an individual citizen of the State of Alabama and is a Data Breach victim.

15. Plaintiff Ericha Evans is and at all times mentioned herein was an individual citizen of the State of Mississippi and is a Data Breach victim.

16. Plaintiff Abigail Liddell is and at all times mentioned herein was an individual citizen of the State of Mississippi and is a Data Breach victim.

17. Plaintiff Sandra McInnis is and at all times mentioned herein was an individual citizen of the State of Mississippi and is a Data Breach victim.

18. Plaintiff Lori Owens is and at all times mentioned herein was an individual citizen of the State of Mississippi and is a Data Breach victim.

19. Plaintiff Amanda Pearson is and at all times mentioned herein was an individual citizen of the State of Mississippi and is a Data Breach victim.

20. Plaintiff Felisa Walters is and at all times mentioned herein was an individual citizen of the State of Mississippi and is a Data Breach victim.

21. Plaintiff Paul Watson is and at all times mentioned herein was an individual citizen of the State of Mississippi and is a Data Breach victim.

22. Defendant First Federal Savings & Loan Association of Pascagoula-Moss Point is a federally chartered savings association with a principal place of business at 903 Jackson Avenue, Pascagoula, Mississippi 39568.

23. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiffs. Plaintiffs will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

24. All of Plaintiffs' claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## III. JURISDICTION AND VENUE

25. This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant to establish minimal diversity.

26. This Court has personal jurisdiction over the parties in this case. Defendant conducts business in this District and is a citizen of this District by virtue of having its principal place of business located in this District.

27. Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant maintains a headquarters in this District and regularly conducts business in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including Defendant collecting and/or storing the Plaintiffs' and Class members' PII.

## IV. FACTUAL ALLEGATIONS

***Background***

28. According to its website, FFSLA "is a leader in mortgage lending for the gulf coast, providing unmatched service on mortgage loans and deposit accounts since 1955."[6]

29. Prior to and through June 10, 2026, Plaintiffs maintained accounts at FFSLA. Defendant obtained Plaintiffs' and Class members' PII, including by collecting it directly from Plaintiffs and Class Members. In the course of providing its services, Defendant maintained Plaintiffs' and Class members' PII and stored it, unencrypted on Defendant's internet-accessible network.

30. Plaintiffs and Class members relied on this sophisticated Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members demand security to safeguard their PII.

31. Defendant had a duty to adopt reasonable measures to protect the Plaintiffs' and Class members' PII from involuntary disclosure to third parties.

***The Data Breach***

32. A data breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Defendant.

33. On or about June 10, 2026, FFSLA experienced a security incident disrupting access to its systems. As above, the breach occurred when a known cybercriminal gang, WorldLeaks, claimed responsibility for a cyberattack against FFSLA, during which the cybercriminals were able to access and exfiltrate Plaintiffs' and Class members' Private

[6] *Id.*, n.1, *supra*.

Information along with potentially several thousand FFSLA customers.[7]

34. Subsequently, WorldLeaks claimed responsibility for having exfiltrated data from Defendant's network and posted a ransom note on its dark web threatening to release the data if the ransom was not paid:




35. It is clear that a known ransomware group stole massive amounts of data from FFSLA's information network.[8]

36. On information and belief, Plaintiffs' and Class members' stolen Private Information has now been published by cybercriminals to the Dark Web as that is the modus operandi of ransomware attackers.[9]

37. As the Harvard Business Review notes, "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained

---

[7] *Id.*, n.3, *supra*.

[8] *Id.*

[9] https://www.paloaltonetworks.com/cyberpedia/what-is-multi-extortion-ransomware (Typically, in a ransomware attack, the criminal actor will not only encrypt the victim's system and block access until a ransom is paid but also exfiltrate data and threaten to release it to the dark web if a ransom is not paid. This scheme is known as a double-extortion attack. This scheme is used because many "organizations overcome the threat of file encryption with a simple up-to-date backup system.").

unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[10]

38. Presently, however, Defendant has provided no public information on the ransom demand or payment.

39. Plaintiffs' and Class members' unencrypted PII may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class members' PII.

40. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiffs and Class Members, causing the exposure of PII for Plaintiffs and Class Members.

41. Because Defendant had a duty to protect Plaintiffs' and Class Members' PII, Defendant should have accessed readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

42. In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks because warnings were readily available and accessible via the internet.

43. Moreover, Defendant's previous data breach during February 2025 put Defendant on notice of the importance of meeting its obligations under statute, regulation, and the common law, and the types of harms associated with such data breaches.

44. In October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that,

---

[10] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[11]

45. Identity crimes are life-altering events. According to the Identity Theft Resource Center (ITRC), 35 percent of victims report losses exceeding $10,000, and 11 percent report losses greater than $1 million.[12]

46. According to the ITRC's findings, 2025 set a new record for the number of data compromises tracked in a year, up four percentage points in 2025 (3,322) from the previous all-time high in 2023 (3,202).

47. The type and breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's customers especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

48. Private Information is a valuable property right.[13] The value of Private Information as a commodity is measurable.[14] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[15] American companies are estimated to have spent

---

[11] FBI, High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations (Oct. 2, 2019) (emphasis added), available at https://www.ic3.gov/Media/Y2019/PSA191002 (last visited June 17, 2026).

[12] https://www.idtheftcenter.org/post/2025-annual-data-breach-report-record-number-compromises/ (last visited June 17, 2026).

[13] *See* Marc Van Lieshout, The Value of Personal Data, 457 IFIP ADVANCES IN INFORMATION & COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . . ").

[14] Robert Lowes, Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

[15] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-andtechnology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

over $19 billion on acquiring personal data of consumers in 2018.[16] It is so valuable to identity thieves that once Private Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for years afterwards.

49. As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, Private Information, and other sensitive information directly on various internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated, and becomes more valuable to thieves and more damaging to victims.

50. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that ***"[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data*** if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[17]

51. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."

[16] U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[17] U.S. CISA, Ransomware Guide–September 2020, available at https://www.cisa.gov/stopransomware/ransomware-guide (last visited June 17, 2026).

52. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims' identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

53. Theft of PII is serious. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

54. The FTC warns consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, open new utility accounts, and incur charges and credit in a person's name.

55. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing freezes on their credit, and correcting their credit reports.

56. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

57. Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

58. Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name,

address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

59. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[18]

60. This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) cybercriminals were targeting companies such as Defendant, (ii) cybercriminals were ferociously aggressive in their pursuit of big companies such as Defendant, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminals' tactics included threatening to release stolen data.

61. In light of the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted Plaintiffs' and Class members' PII in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII and Defendant's type of business had cause to be particularly on guard against such an attack.

62. Prior to the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack.

63. Prior to the Data Breach, Defendant knew or should have known that it should have encrypted the Social Security numbers and other sensitive data elements within the PII to

[18] Janice Y. Tsai, et al., The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.guanotronic.com/~serge/papers/isr10.pdf.

protect against their publication and misuse in the event of a cyberattack.

***Defendant Acquires, Collects, and Stores the Plaintiffs' and Class members' PII.***

64. Defendant acquired, collected, and stored the Plaintiffs' and Class members' PII.

65. By obtaining, collecting, and storing the Plaintiffs' and Class members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

66. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

67. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

a. Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

b. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

c. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d. Configure firewalls to block access to known malicious IP addresses.

e. Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

f. Set anti-virus and anti-malware programs to conduct regular scans automatically.

g. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those

with a need for administrator accounts should only use them when necessary.

h. Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

j. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

k. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

l. Execute operating system environments or specific programs in a virtualized environment.

m. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

68. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[19]

69. Given that Defendant was storing the PII of potentially thousands of individuals, Defendant could and should have implemented all the above measures to prevent and detect ransomware attacks.

70. Alternatively, Defendant could have destroyed the data it no longer had a reasonable need to maintain or only stored data in an Internet-accessible environment when there was a reasonable need to do so.

71. The ramifications of Defendant's failure to keep secure the Plaintiffs' and Class members' PII are long-lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

[19] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), available at https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited June 17, 2026).

***Value of Personal Identifiable Information***

72. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[20] Experian reports that a stolen credit or debit card number can sell for $5 to $240 on the dark web.[21]

73. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

74. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[22]

75. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

76. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

[20] https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited June 17, 2026).
[21] https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited June 17, 2026).
[22] https://www.redseal.net/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers/ (last visited June 17, 2026).

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[23]

77. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Plaintiffs' and Class members' PII, including Social Security numbers, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

78. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

79. Defendant was, or should have been, fully aware of the unique type and the significant volume of data contained in Defendant's database, amounting to potentially thousands of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

80. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Plaintiffs' and Class members' PII.

**Plaintiff Portia Armstrong's Experiences**

81. Plaintiff Portia Armstrong became aware on or about June 10, 2026, that her Private Information was included as part of the Data Breach.

82. As a condition of obtaining banking and financial services, Plaintiff Armstrong

[23] Report to Congressional Requesters, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited June 17, 2026).

was required to provide Defendant with her Private Information, including her name, Social Security number, date of birth, contact information. Thus, Plaintiff Armstrong' Private Information was within Defendant's possession and control at the time of the Data Breach. As a result, Plaintiff Armstrong' information was among the data exfiltrated in the Data Breach.

83. Plaintiff Armstrong reasonably understood and expected that Defendant would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Armstrong would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

84. As a result, Plaintiff Armstrong spent time, and continues to spend time, dealing with the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, self-monitoring her accounts and seeking legal counsel regarding her options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured. In total, Plaintiff Armstrong has lost at least two (2) hours.

85. Plaintiff Armstrong suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Armstrong entrusted to Defendant, which was compromised in and as a result of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

86. Plaintiff Armstrong is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

87. Shortly after the Data Breach, Plaintiff Armstrong began receiving an excessive

number of spam calls and texts. This spam is a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, she believes that spam is related to her stolen Private Information.

88. Plaintiff Armstrong suffered lost time, annoyance, interference and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using and selling Plaintiff Armstrong's Private Information.

89. Plaintiff Armstrong suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft and misuse resulting from her Private Information being placed in the hands of unauthorized third parties/criminals. Plaintiff Armstrong has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Ericha Evans' Experiences**

90. Plaintiff Ericha Evans became aware on or about June 10, 2026, that her Private Information was included as part of the Data Breach.

91. As a condition of obtaining banking and financial services, Plaintiff Evans was required to provide Defendant with her Private Information, including her name, Social Security number, date of birth, contact information. Thus, Plaintiff Evans' Private Information was within Defendant's possession and control at the time of the Data Breach. As a result, Plaintiff Evans' information was among the data exfiltrated in the Data Breach.

92. Plaintiff Evans reasonably understood and expected that Defendant would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Evans would not have allowed Defendant, or anyone in Defendant's position, to

maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

93. As a result, Plaintiff Evans spent time, and continues to spend time, dealing with the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, self-monitoring her accounts and seeking legal counsel regarding her options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured. In total, Plaintiff Evans has lost at least two (2) hours.

94. Plaintiff Evans suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Evans entrusted to Defendant, which was compromised in and as a result of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

95. Plaintiff Evans is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

96. Shortly after the Data Breach, Plaintiff Evans began receiving an excessive number of spam calls and texts. This spam is a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, she believes that spam is related to her stolen Private Information.

97. Plaintiff Evans suffered lost time, annoyance, interference and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using and selling Plaintiff Evans's Private Information.

98. Plaintiff Evans suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft and misuse resulting from her Private

Information being placed in the hands of unauthorized third parties/criminals. Plaintiff Evans has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Abigail Liddell's Experiences**

99. Plaintiff Abigail Liddell became aware on or about June 10, 2026, that her Private Information was included as part of the Data Breach.

100. As a condition of obtaining banking and financial services, Plaintiff Liddell was required to provide Defendant with her Private Information, including her name, Social Security number, date of birth, contact information. Thus, Plaintiff Liddell's Private Information was within Defendant's possession and control at the time of the Data Breach. As a result, Plaintiff Liddell's information was among the data exfiltrated in the Data Breach.

101. Plaintiff Liddell reasonably understood and expected that Defendant would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Liddell would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

102. As a result, Plaintiff Liddell spent time, and continues to spend time, dealing with the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, self-monitoring her accounts and seeking legal counsel regarding her options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured. In total, Plaintiff Liddell has lost at least two (2) hours.

103. Plaintiff Liddell suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Liddell entrusted

to Defendant, which was compromised in and as a result of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

104. Plaintiff Liddell is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

105. Shortly after the Data Breach, Plaintiff Liddell began receiving an excessive number of spam calls and texts. This spam is a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, she believes that spam is related to her stolen Private Information.

106. Plaintiff Liddell suffered lost time, annoyance, interference and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using and selling Plaintiff Liddell's Private Information.

107. Plaintiff Liddell suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft and misuse resulting from her Private Information being placed in the hands of unauthorized third parties/criminals. Plaintiff Liddell has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Sandra McInnis' Experiences**

108. Plaintiff Sandra McInnis became aware on or about June 10, 2026, that her Private Information was included as part of the Data Breach.

109. As a condition of obtaining banking and financial services, Plaintiff McInnis was required to provide Defendant with her Private Information, including her name, Social Security number, date of birth, contact information. Thus, Plaintiff McInnis' Private Information was within Defendant's possession and control at the time of the Data Breach. As a result, Plaintiff McInnis'

information was among the data exfiltrated in the Data Breach.

110. Plaintiff McInnis reasonably understood and expected that Defendant would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff McInnis would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

111. As a result, Plaintiff McInnis spent time, and continues to spend time, dealing with the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, self-monitoring her accounts and seeking legal counsel regarding her options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured. In total, Plaintiff McInnis has lost at least two (2) hours.

112. Plaintiff McInnis suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff McInnis entrusted to Defendant, which was compromised in and as a result of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

113. Plaintiff McInnis is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

114. Shortly after the Data Breach, Plaintiff McInnis began receiving an excessive number of spam calls and texts. This spam is a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, she believes that spam is related to her stolen Private Information.

115. Plaintiff McInnis suffered lost time, annoyance, interference and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using and selling Plaintiff McInnis' Private Information.

116. Plaintiff McInnis suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft and misuse resulting from her Private Information being placed in the hands of unauthorized third parties/criminals. Plaintiff McInnis has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Lori Owens' Experiences**

117. Plaintiff Lori Owens became aware on or about June 10, 2026, that her Private Information was included as part of the Data Breach.

118. As a condition of obtaining banking and financial services, Plaintiff Owens was required to provide Defendant with her Private Information, including her name, Social Security number, date of birth, contact information. Thus, Plaintiff Owens' Private Information was within Defendant's possession and control at the time of the Data Breach. As a result, Plaintiff Owens' information was among the data exfiltrated in the Data Breach.

119. Plaintiff Owens reasonably understood and expected that Defendant would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Owens would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

120. As a result, Plaintiff Owens spent time, and continues to spend time, dealing with

the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, self-monitoring her accounts and seeking legal counsel regarding her options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured. In total, Plaintiff Owens has lost at least two (2) hours.

121. Plaintiff Owens suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Owens entrusted to Defendant, which was compromised in and as a result of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

122. Plaintiff Owens is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

123. Shortly after the Data Breach, Plaintiff Owens began receiving an excessive number of spam calls and texts. This spam is a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, she believes that spam is related to her stolen Private Information.

124. Plaintiff Owens suffered lost time, annoyance, interference and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using and selling Plaintiff Owens' Private Information.

125. Plaintiff Owens suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft and misuse resulting from her Private Information being placed in the hands of unauthorized third parties/criminals. Plaintiff Owens has a continuing interest in ensuring that her Private Information, which, upon information and belief,

remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Amanda Pearson's Experiences**

126. Plaintiff Amanda Pearson became aware on or about June 10, 2026, that her Private Information was included as part of the Data Breach.

127. As a condition of obtaining banking and financial services, Plaintiff Pearson was required to provide Defendant with her Private Information, including her name, Social Security number, date of birth, contact information. Thus, Plaintiff Pearson's Private Information was within Defendant's possession and control at the time of the Data Breach. As a result, Plaintiff Pearson's information was among the data exfiltrated in the Data Breach.

128. Plaintiff Pearson reasonably understood and expected that Defendant would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Pearson would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

129. As a result, Plaintiff Pearson spent time, and continues to spend time, dealing with the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, self-monitoring her accounts and seeking legal counsel regarding her options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured. In total, Plaintiff Pearson has lost at least two (2) hours.

130. Plaintiff Pearson suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Pearson entrusted to Defendant, which was compromised in and as a result of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and

expenses.

131. Plaintiff Pearson is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

132. Shortly after the Data Breach, Plaintiff Pearson began receiving an excessive number of spam calls and texts. This spam is a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, she believes that spam is related to her stolen Private Information.

133. Plaintiff Pearson suffered lost time, annoyance, interference and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using and selling Plaintiff Pearson's Private Information.

134. Plaintiff Pearson suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft and misuse resulting from her Private Information being placed in the hands of unauthorized third parties/criminals. Plaintiff Pearson has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Felisa Walters' Experiences**

135. Plaintiff Felisa Walters became aware on or about June 10, 2026, that her Private Information was included as part of the Data Breach.

136. As a condition of obtaining banking and financial services, Plaintiff Walters was required to provide Defendant with her Private Information, including her name, Social Security number, date of birth, contact information. Thus, Plaintiff Walters' Private Information was within Defendant's possession and control at the time of the Data Breach. As a result, Plaintiff Walters'

information was among the data exfiltrated in the Data Breach.

137. Plaintiff Walters reasonably understood and expected that Defendant would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Walters would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

138. As a result, Plaintiff Walters spent time, and continues to spend time, dealing with the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, self-monitoring her accounts and seeking legal counsel regarding her options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured. In total, Plaintiff Walters has lost at least two (2) hours.

139. Plaintiff Walters suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Walters entrusted to Defendant, which was compromised in and as a result of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

140. Plaintiff Walters is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

141. Shortly after the Data Breach, Plaintiff Walters began receiving an excessive number of spam calls and texts. This spam is a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, she believes that spam is related to her stolen Private Information.

142. Plaintiff Walters suffered lost time, annoyance, interference and inconvenience as

a result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using and selling Plaintiff Walters's Private Information.

143. Plaintiff Walters suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft and misuse resulting from her Private Information being placed in the hands of unauthorized third parties/criminals. Plaintiff Walters has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Paul Watson's Experiences**

144. Plaintiff Paul Watson became aware on or about June 10, 2026, that his Private Information was included as part of the Data Breach.

145. As a condition of obtaining banking and financial services, Plaintiff Watson was required to provide Defendant with his Private Information, including his name, Social Security number, date of birth, contact information. Thus, Plaintiff Watson's Private Information was within Defendant's possession and control at the time of the Data Breach. As a result, Plaintiff Watson's information was among the data exfiltrated in the Data Breach.

146. Plaintiff Watson reasonably understood and expected that Defendant would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff Watson would not have allowed Defendant, or anyone in Defendant's position, to maintain his Private Information if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

147. As a result, Plaintiff Watson spent time, and continues to spend time, dealing with the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, self-monitoring his accounts and seeking

legal counsel regarding his options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured. In total, Plaintiff Watson has lost at least two (2) hours.

148. Plaintiff Watson suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff Watson entrusted to Defendant, which was compromised in and as a result of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

149. Plaintiff Watson began receiving an excessive number of spam calls and texts. This spam is a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, he believes that spam is related to his stolen Private Information.

150. Plaintiff Watson suffered lost time, annoyance, interference and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using and selling Plaintiff Watson's Private Information.

151. Plaintiff Watson suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft and misuse resulting from his Private Information being placed in the hands of unauthorized third parties. Plaintiff Watson has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

152. Plaintiff Watson is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

**Plaintiffs' and Class Members' Common Injuries**

153. To date, Defendant has done nothing to compensate Plaintiffs and Class members for the damages they sustained in the Data Breach.

154. Furthermore, Defendant's failure to safeguard Plaintiffs' and Class members' Private Information, places the burden squarely on Plaintiffs and the Class, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts and omissions resulting in the Data Breach.

155. Plaintiffs and Class members have been damaged by the compromise and exfiltration, by cybercriminals, of their Private Information as a result of the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

156. Plaintiffs and Class members were damaged in that their Private Information is now in the hands of cybercriminals being sold and potentially for sale for years into the future.

157. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft, especially in light of the actual fraudulent misuse of the Private Information that has already taken place, as alleged herein.

158. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been forced to expend time dealing with the effects of the Data Breach.

159. Plaintiffs and Class members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, for medical care and services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiffs and Class members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

160. Plaintiffs and Class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential

fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class members.

161. Plaintiffs and Class members also suffered a loss of value of their Private Information when it was acquired by cyberthieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

162. Plaintiffs and Class members have spent and will continue to spend significant amounts of time monitoring their financial accounts and records for misuse.

163. Plaintiffs and Class members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Monitoring their medical records for fraudulent charges and data;

e. Addressing their inability to withdraw funds linked to compromised accounts;

f. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g. Placing "freezes" and "alerts" with credit reporting agencies;

h. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i. Contacting financial institutions and closing or modifying financial accounts;

j. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k. Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

164. Moreover, Plaintiffs and Class members have an interest in ensuring that their Private Information, which is believed to remain in Defendant's possession, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password-protected.

165. Further, as a result of Defendant's conduct, Plaintiffs and Class members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

166. Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of Private Information. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft.

## V. CLASS ACTION ALLEGATIONS

167. Plaintiffs bring this nationwide class action individually and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

168. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All persons in the United States and its territories whose PII was compromised in the Data Breach (the "Nationwide Class").

169. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which

Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

170. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

171. Numerosity, Fed R. Civ. P. 23(a)(1): The Class is so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Private Information of potentially several thousand other of Defendant's customers' account information was impacted in the Data Breach, and the Class is apparently identifiable within Defendant's records.

172. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include *inter alia*:

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' Private Information from unauthorized access and disclosure;

b. Whether Defendant's actions and its allegedly lax data security practices used to protect Plaintiffs' and class members' PII violated the FTC Act and/or other state laws and/or Defendant's other duties alleged herein;

c. Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and class members;

d. Whether Plaintiffs and class members suffered injury as a proximate result of Defendant's negligent actions or failures to act;

e. Whether Defendant failed to exercise reasonable care to secure and safeguard

Plaintiffs' and class members' PII;

f. Whether an implied contract existed between class members and Defendant providing that Defendant would implement and maintain reasonable security measures to protect and secure class members' PII from unauthorized access and disclosure;

g. Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiffs and class members;

h. Whether Defendant's actions and inactions alleged herein constitute gross negligence;

i. Whether Defendant breached its duties to protect Plaintiffs and class members' Private Information; and

j. Whether Plaintiffs and all other members of the Class are entitled to damages and the measure of such damages and relief.

173. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of all other class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

174. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendant's misfeasance.

175. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs challenge to these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

176. Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs received the notification of the data breach and has experienced actual damages as a result of the breach. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs has retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

177. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

178. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the

costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

179. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

180. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

181. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to class members' names and addresses affected by the Data Breach. Indeed, class members have already been preliminarily identified and sent notice of the Data Breach.

182. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

183. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

184. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would

advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e. Whether Defendant breached the implied contract;

f. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Plaintiffs' and Class members' PII; and,

i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**<u>COUNT I</u>**
**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Class)**

185. Plaintiffs restate and reallege all the preceding allegations above as if fully alleged herein.

186. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Nationwide Class could and would suffer if the PII was wrongfully disclosed.

187. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Nationwide Class involved

an unreasonable risk of harm to Plaintiffs and the Nationwide Class, even if the harm occurred through the criminal acts of a third party.

188. Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the PII of Plaintiffs and the Nationwide Class in Defendant's possession was adequately secured and protected.

189. Defendant also had a duty to exercise appropriate clearinghouse practices to remove from an Internet-accessible environment the PII it was no longer required to retain pursuant to regulations and had no reasonable need to maintain in an Internet-accessible environment.

190. Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiffs and the Nationwide Class.

191. Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and the Nationwide Class. That special relationship arose because Defendant acquired Plaintiffs and the Nationwide Class's confidential PII in the course of its business practices.

192. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Nationwide Class.

193. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Nationwide Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

194. Plaintiffs and the Nationwide Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the

inherent risks in collecting and storing the PII of Plaintiffs and the Nationwide Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

195. Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and the Nationwide Class. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of the PII of Plaintiffs and the Nationwide Class, including basic encryption techniques freely available to Defendant.

196. Plaintiffs and the Nationwide Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

197. Defendant was in a position to protect against the harm suffered by Plaintiffs and the Nationwide Class as a result of the Data Breach.

198. Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiffs and the Nationwide Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Nationwide Class to (i) take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties and (ii) prepare for the sharing and detrimental use of their sensitive information.

199. Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiffs and the Nationwide Class.

200. Defendant has admitted that the PII of Plaintiffs and the Nationwide Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

201. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and the Nationwide Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiffs and the Nationwide Class during the time the PII was within Defendant's possession or control.

202. Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Nationwide Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

203. Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiffs and the Nationwide Class in the face of increased risk of theft.

204. Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and the Nationwide Class by failing to have appropriate procedures in place to detect and prevent dissemination of the PII.

205. Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove from the Internet-accessible environment any PII it was no longer required to retain pursuant to regulations and which Defendant had no reasonable need to maintain in an Internet-accessible environment.

206. Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and the Nationwide Class the existence and scope of the Data Breach.

207. But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Nationwide Class, the PII of Plaintiffs and the Nationwide Class would not have been compromised.

208. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Nationwide Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Nationwide Class. The PII of Plaintiffs and the Nationwide Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

209. As a direct and proximate result of Defendant's negligence, Plaintiffs and the Nationwide Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and the Nationwide Class; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Nationwide Class.

210. As a direct and proximate result of Defendant's negligence, Plaintiffs and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm,

including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

211. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and the Nationwide Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

212. As a direct and proximate result of Defendant's negligence, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

**COUNT II**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and Class Members)**

213. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

214. This Claim is pleaded in the alternative to Count I above.

215. When Plaintiffs and Class members provided their Private Information to Defendant in exchange for Defendant's services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

216. Defendant solicited, offered, and invited Class members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class members accepted Defendant's offers and provided their Private Information to Defendant.

217. In entering into such implied contracts, Plaintiffs and Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

218. Plaintiffs and Class members paid money to Defendant with the reasonable belief

and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

219. Plaintiffs and Class members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

220. Plaintiffs and Class members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

221. Plaintiffs and Class members fully and adequately performed their obligations under the implied contracts with Defendant.

222. Defendant breached its implied contracts with Class members by failing to safeguard and protect their Private Information.

223. As a direct and proximate result of Defendant's breach of the implied contracts, Class members sustained damages as alleged herein, including the loss of the benefit of the bargain.

224. Plaintiffs and Class members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

225. Plaintiffs and Class members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate long-term credit monitoring to all Class members.

**<u>COUNT III</u>**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Class)**

226. Plaintiffs restate and reallege all the preceding allegations above as if fully alleged

herein.

227. Plaintiffs bring this claim individually and on behalf of the Class in the alternative to Plaintiffs' contractual based claims pursuant to Fed. R. Civ. P. 8.

228. Upon information and belief, Defendant funds its data security measures utilizing payments made by or on behalf of Plaintiffs and the class members.

229. As such, a portion of the payments made by or on behalf of Plaintiffs and the class members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

230. Plaintiffs and class members conferred a monetary benefit on Defendant. Specifically, they purchased financial services from FFSLA, or its agents and in so doing provided Defendant with their PII. In exchange, Plaintiffs and class members should have received from Defendant the goods and services that were the subject of the transaction and had their PII protected with adequate data security.

231. Defendant knew that Plaintiffs and class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Plaintiffs' and Class members' PII for business purposes.

232. In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and class members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead elected to increase its own profits at the expense of Plaintiffs and class members by utilizing cheaper, ineffective security measures. Plaintiffs and class members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

233. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and class members, because Defendant failed to implement appropriate data management and security measures that are mandated by its common law and statutory duties.

234. Defendant failed to secure Plaintiffs and class members' PII and, therefore, did not provide full compensation for the benefit Plaintiffs and class members provided.

235. Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

236. If Plaintiffs and class members knew that Defendant had not reasonably secured their PII, they would not have agreed to provide their PII to Defendant.

237. Plaintiffs and class members have no adequate remedy at law.

238. As a direct and proximate result of Defendant's conduct, Plaintiffs and class members have suffered and will continue to suffer other forms of injury and/or harm.

239. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and class members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and class members overpaid for Defendant's services.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all other Class Members, request judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Nationwide Class and the Class and appointing Plaintiffs and their Counsel to represent such Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Plaintiffs' and Class

members' PII, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class Members;

C. For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Plaintiffs' and Class members' PII;

v. prohibiting Defendant from maintaining the Plaintiffs' and Class members' PII on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x. requiring Defendant to conduct regular database scanning and securing checks;

xi. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand that this matter be tried before a jury.

Dated: June 26, 2026

Respectfully submitted,

*/s/ Don Barrett*

John W. ("Don") Barrett (MSB #2063)
Katherine B. Riley (MSB #99109)
BARRETT LAW GROUP, P.A.
404 Court Square
Lexington, Mississippi 39095
Telephone: (662) 834-2488
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com
kbriley@barrettlawgroup.com

Gary Yarborough, Jr. (MSB #102310)
Yarborough Law Firm, PLLC
P.O. Box 4168
Bay Saint Louis, MS 39521
Tel: (228) 342-7987
Fax: (662) 834-2628
Gary@yarboroughlaw.co

Marc H. Edelson*
Liberato P. Verderame*
EDELSON LECHTZIN LLP
411 S. State Street, Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
Facsimile: 267-685-0676
Email: medelson@edelson-law.com
lverderame@edelson-law.com

*Counsel for Plaintiffs and the Proposed Class*

* *pro hac vice* forthcoming